UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHIRLEY JANE MILLER,

      Plaintiff,                            Civil Action No. 14-11225

v.                                    HON.  AVERN COHN
                                    U.S. District Judge
                                    HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL         U.S. Magistrate Judge
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

      Plaintiff Shirley Jane Miller ("Plaintiff") brings this action under 42 U.S.C. §405(g) challenging a final  decision of Defendant Commissioner denying her application for Supplemental Security Income under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

      Plaintiff applied for  Supplemental Security Income ("SSI") on October 31, 2007, alleging disability as of the same date (Tr. 396, 429).   After the initial denial of the claim,

Plaintiff requested an administrative hearing. On June 17, 2010, Administrative Law Judge ("ALJ") Joel G. Fina found that she was not disabled (Tr. 155-173). On June 17, 2011 the Appeals Council remanded the case for additional consideration of the medical opinion evidence and the effect of Plaintiff's obesity on her work abilities (Tr. 175-177). ALJ Fina presided at a second hearing on April 5, 2012 (Tr. 43). Plaintiff, represented by attorney Andrea Hamm, testified (Tr. 47-74), as did Vocational Expert ("VE") Amy Mowry (Tr. 75-82). On April 27, 2012, another ALJ, Patrick J. MacLean, found that Plaintiff was not disabled (Tr. 25-36). On January 24, 2014, the Appeals Council denied review (Tr. 1-3). Plaintiff filed for judicial review of the final decision on March 25, 2014.

## BACKGROUND FACTS

Plaintiff, born on July 16, 1973, was 38 when the ALJ issued his decision (Tr. 27). She left school after 10th grade and worked previously as an assembler, fast food worker, dishwasher, laborer, and nurse's aide (Tr. 402, 406). She alleges disability as a result of back pain, arthritis, and depression (Tr. 401).

### A.    Plaintiff's Testimony (April 5, 2012 Hearing)

Plaintiff offered the follow testimony:

She lived with her son, 17 and her daughter, 4, in a townhouse in St. Louis, Michigan (Tr. 47). Plaintiff, right-handed, stood 5' 6" and weighed 174 pounds (Tr. 48). She left school after 10th grade (Tr. 48). She did not read "very well" (Tr. 48). Currently, she did not shop due to anxiety (Tr. 49). She last shopped about six months before the hearing, noting

-2-

that she "went down two lanes," after which she left the store due to overwhelming anxiety (Tr. 49). She last worked in 2005 (Tr. 49). She last worked as an assembler, but quit the position because she was unable to handle the lifting, standing, and bending requirements of the position (Tr. 49). Plaintiff did not experience problems interacting with others while at work (Tr. 57). She attempted to procure other work through "Michigan Work First," but experienced an anxiety attack before completing the application process (Tr. 49). She did not receive Workers' Compensation but currently received both public assistance and food stamps (Tr. 50). She had been unsuccessful in obtaining child support payments from the father of her youngest child (Tr. 51). She had not held a driver's license since receiving a DUI conviction nine years before the hearing (Tr. 51). She later received a second conviction, after which time she stopped using alcohol or illicit drugs (Tr. 58). She had not used alcohol or cocaine in the last five years (Tr. 51). Her former drug addition and the current condition of anxiety was attributable to her stepfather's molestation (Tr. 59). She experienced around three panic attacks each week characterized by a raising pulse (Tr. 60). Due to anxiety, she did not go to the mailbox outside her home until after nightfall (Tr. 60).

Plaintiff had undergone x-ray studies but no MRIs (Tr. 61). She had not been examined by an orthopedic surgeon (Tr. 62). Plaintiff acknowledged that in 2008, she left her home to help her now-deceased grandmother with household chores (Tr. 63). She admitted that she could function in public as long as she was with a family member and there were no "loud crowd[s]" (Tr. 63-64). She did not attend church (Tr. 64). She received visits

from her sister, oldest son, and niece (Tr. 64).  She denied any recent suicide attempts (Tr. 64).  She would be unable to perform work requiring any contact with coworkers (Tr. 64-65).  Her sister and niece helped her take care of her youngest child (Tr. 65).  Her son performed most of the housework and the yard work (Tr. 65).  Her back pain was worse at night (Tr. 66).  She regularly experienced level "10" pain and ongoing migraine headaches (Tr. 66).  Her headaches made her feel as if her brain was "just going to explode . . ." (Tr. 67).  Migraine medication took approximately one hour to work (Tr. 67).  She had recently been diagnosed with a heel spur and did not see well out of her left eye (Tr. 67).

Plaintiff relied on her son to do most of the cooking, noting that she did not know how to measure ingredients (Tr. 52).  She experienced back problems after standing for long periods (Tr. 52).  Her son performed most of the household and laundry chores but she was able to fold clothes if she were sitting (Tr. 52).  She relied on a friend for rides (Tr. 53).  She did not know how to use a computer (Tr. 53).  She had been attending psychological counseling sessions once a week (Tr. 53, 69).  Due to physical problems, she no longer engaged in her former hobby of planting flowers (Tr. 53).  She watched television approximately six hours every day and smoked a half pack of cigarettes daily (Tr. 54).

Plaintiff typically arose at 10:00 a.m. then would prepare her daughter's breakfast, drink coffee, and watch cartoons with her daughter (Tr. 54).  She spent long periods each day watching television but also played with her daughter (Tr. 55).  She was unable to stand or walk for more than 45 minutes or lift more than 10 pounds (Tr. 55).  She was able to change

-4-

her own socks (Tr. 56).  On a scale of 1 to 10, she characterized her current pain as a "6" (Tr. 57).  She currently took Xanax for anxiety, Lexapro for depression, Vicodin for pain, Zantac for a stomach condition, migraine headache medication, and medication for Attention Deficit Hyperactivity Disorder ("ADHD") (Tr. 57).  She experienced crying jags three or four times each week (Tr. 69).  She typically retired at nine or ten o'clock each night (Tr. 70).  She denied medication side effects (Tr. 71).  A few months before the hearing, she traveled to West Virginia (Tr. 72).  Since applying for benefits, she had moved "up North," adding that she made a two-hour trip to her former home on a periodic basis to get medication refills (Tr. 73).  She coped with the long car trips by stopping at a restaurant or rest stops (Tr. 74).

## B.    Medical Evidence[1]

### 1.    Treatment-Related Sources

A November, 2006 x-ray of the lumbar spine showed "minimal arthritis" at L4-L5 (Tr. 540, 646).  In February, 2007, Plaintiff reported frequent sleep disturbances and a chronic loss of energy (Tr. 530).  She noted chronic back pain as a result of an "epidural" (Tr. 610).  The same month, Plaintiff sought emergency treatment for nausea and vomiting (Tr. 514, 602).  In May, 2007, Surinder Kaura, M.D. noted that Plaintiff's back pain had been exacerbated by heavy lifting (Tr. 523).  Plaintiff reported stress resulting from her boyfriend's incarceration (Tr. 523, 615).  Her back and lower extremities appeared unremarkable (Tr. 514).  In July, 2007, Plaintiff was transported to the emergency room by

---

[1]Transcript pages 731-746, 748-749, and 762 refer to another individual.

the police for alcohol abuse (Tr. 595-596). In August, 2007, Dr. Kaura noted Plaintiff's report of migraines, anxiety, and "chronic" back pain (Tr. 520). Dr. Kaura's October, 2007 treating records state that Plaintiff was not in acute distress and did not exhibit lower extremity problems (Tr. 618).

Dr. Kaura's February, 2008 treating records state that Plaintiff experienced an ear infection and continued to experience back pain but did not appear to be in distress (Tr. 621). Dr. Kaura's April, 2008 records note that Plaintiff reported increased back pain (Tr. 624). The following month and in July, 2008, Dr. Kaura attributed Plaintiff's pain to arthritis (Tr. 625-627). Dr. Kaura prescribed Xanax in response to Plaintiff's reports of "panic and anxiety" (Tr. 627). November, 2008 treating notes state that Plaintiff was helping an injured relative with daily activities (Tr. 632). In December, 2008, Plaintiff sought emergency treatment for nausea and vomiting (Tr. 586).

Dr. Kaura's February, 2009 treating records state that Plaintiff had "heavy work" (Tr. 636). Plaintiff reported that the work exacerbated the spine condition (Tr. 636). Plaintiff reported that she had increased frequency of migraine headaches and was depressed (Tr. 636). In March, 2009, Dr. Kaura found that Plaintiff required help with meal preparation, shopping, laundry, and housework due to back problems (Tr. 580). In July, 2009, Dr. Kaura again found that Plaintiff required help with meal preparation, shopping, laundry, and housework (Tr. 655). Dr. Kaura's examination notes from the same month state that Plaintiff experienced arthritis of the spine (Tr. 704). In September, 2009, physician's assistant

-6-

Heather Mata found that due to back problems and hand numbness, Plaintiff was unable to lift even 10 pounds or stand or walk for two hours in an eight-hour workday (Tr. 652-654). The same month, Mata prescribed a refill of Xanax for anxiety (Tr. 684).

December, 2009 psychological intake records note a GAF of 38[2] due to a mood disorder, learning disability, arthritis, headaches, and sleep apnea (Tr. 659). Plaintiff stated that she sought to cope with "life stressors" and stabilize her mood (Tr. 661). Plaintiff exhibited a normal attention span with intact memory (Tr. 671). She was cooperative with an anxious and depressed mood (Tr. 670). She did not exhibit hallucinations or delusions (Tr. 670). She was not suicidal or homicidal (Tr. 670). She reported headaches as a result of substance abuse withdrawal (Tr. 670). Plaintiff noted that she had two alcohol related arrests and a domestic violence arrest (Tr. 667). Plaintiff reported that she had tried but failed to obtain a GED (Tr. 666). She reported that she had not used alcohol in three years (Tr. 665).

Medical records from the same month note back, joint and muscle pain and anxiety (Tr. 689). Heather Mata composed a letter on Plaintiff's behalf, stating that Plaintiff was unable to "spend extended time in a sitting or standing position . . ." (Tr. 700). Mata also noted a history of anxiety and panic attacks (Tr. 700). A January, 2010 work release note by

---

[2]

A GAF score of 31–40 indicates "some impairment in reality testing or communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood." *Diagnostic and Statistical Manual of Mental Disorders–Text Revision* ( "*DSM–IV–TR*" ), 34(4th ed.2000).

Mata states that Plaintiff would be able to return to work without restriction as of January 15, 2010 (Tr. 694). The same month, social worker Michelle R. Haggart stated that Plaintiff had been receiving weekly outpatient therapy since the previous month (Tr. 701). Therapy notes state that she experienced a panic attack while filling out a job application for the Michigan Works program (Tr. 728, ). The same month, Plaintiff sought emergency treatment for a migraine headache (Tr. 939). The following month, Plaintiff presented with "a brighter affect" and less anxiety (Tr. 723). She reported that she did not experience a panic attack during a store visit (Tr. 723). In March, 2010, Plaintiff reported that her teenage son's psychological issues created stress (Tr. 718-719). The following month, imaging studies of the thoracic and cervical spine taken following an injury were normal (Tr. 886-887, 909). In June, 2010, Plaintiff reported that her prescription medication had been stolen (Tr. 829). Plaintiff sought emergency treatment in September, 2009 for anxiety (Tr. 892, 896). A November, 2010 x-ray of the knees, hand, and ankle taken following an assault were normal (Tr. 881-882, 884-885).

February, 2011 psychological treating records state that Plaintiff's "disability," due to her psychological condition, substance abuse, and medical conditions, would be expected to last more than one year (Tr. 785). The same month, Dr. Kaura noted a normal affect and mood (Tr. 825). April, 2011 imaging studies of the right shoulder, and lumbosacral, thoracic, and cervical spine taken after Plaintiff reported taking a fall were unremarkable (Tr. 871-872, 874-875). A CT of the head was also normal (Tr. 876). In June, 2011, Plaintiff underwent

-8-

an appendectomy (Tr. 820). In July, 2011, she reported that she had recently pled guilty to being "an accessory to a stolen credit card" (Tr. 776). Her interpersonal limitation was deemed "moderate" (Tr. 783). Her concentrational problems were deemed "mild" (Tr. 781). The same month, she reported left knee pain after hitting a pothole while riding her bike (Tr. 818). An x-ray of the left knee was unremarkable (Tr. 834). She was diagnosed with a sprained knee (Tr. 839, 848). In October, 2011, Plaintiff reported a headache accompanied by nausea and vomiting (Tr. 795). In December, 2011, Plaintiff reported severe neck and shoulder pain following an auto accident (Tr. 812). Dr. Kaura's notes from the next month state that Plaintiff did not experience any broken bones (Tr. 815). March, 2012 case management notes state that Plaintiff sought help "to try to get her disability" (Tr. 1000). Her strengths were identified as good housing, a good support network, and good physical health (Tr. 1000). Adverse factors included "limited education and a preoccupation with secondary gain" (Tr. 1000). She was assigned a GAF of 50 (Tr. 1000). April, 2012 case management notes state that due to agoraphobia type symptoms, Plaintiff required help making grocery trips and scheduling transportation to appointments (Tr. 995).

## 2. Non-treating Sources

In January, 2008 Elizabeth W. Edmond, M.D. performed a physical examination on behalf of the SSA, noting Plaintiff's report of low back pain and stiffness (Tr. 542). Plaintiff reported that she used a cane "due to her right leg" (Tr. 542). Plaintiff reported that she obtained a GED (Tr. 542). She was able to dress herself without help (Tr. 543). Dr.

Edmond noted that the left leg was shorter than the right (Tr. 544).

The same day, Dasivi Baddigam, M.D. performed a consultative psychiatric evaluation, noting Plaintiff's report of depression since the age of 14 (Tr. 550). She reported anxiety attacks "once or twice a week" (Tr. 550). Dr. Baddigam noted that Plaintiff, 34, had worked a total of six years (Tr. 550).

Dr. Baddigam noted "clear, coherent, and goal directed" speech (Tr. 551). She appeared fully oriented (Tr. 551). He noted a diagnosis of major depression "in partial remission" and a panic disorder with agoraphobia (Tr. 552). He assigned Plaintiff a GAF of 50[3]   Later the same month, Leonard C. Balunas, Ph.D. completed a non-examining Psychiatric Review Technique, finding the presence of an affective disorder (depression) and anxiety (Tr. 566, 569-571). Under the "'B' Criteria," Dr. Balunas found the presence of mild restriction in activities of daily living and social functioning and moderate restriction in concentration, persistence, or pace (Tr. 576). Dr. Balunas completed a Mental Residual Functional Capacity Assessment, finding the presence of moderate limitation in the ability to understand, remember, and carry out detailed instructions; maintain attention for extended periods; respond appropriately to workplace changes; and travel to unfamiliar places (Tr. 563).

---

[3]

A GAF score of 41–50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *DSM–IV–TR* at 34.

## C.  The Vocational Expert

VE Mowry characterized the Plaintiff's former job as an assembly line worker as unskilled and exertionally medium (exertionally heavy as performed)[4] (Tr. 76).  The ALJ then posed the following question to the VE, describing a hypothetical individual of Plaintiff's age and education:

> [A]ssume a person who is able to lift up to 20 pounds occasionally, lift or carry up to 10 pounds frequently, and light work as defined by the regulations.  This person could never climb ladders, ropes or scaffolds, occasionally climb ramps or stairs, occasionally balance, occasionally stoop, occasionally crouch, occasionally kneel, and never crawl.  This person must avoid all exposure to unprotected heights.  This person's work is limited to simple, routine and repetitive tasks but without specifying the number of steps required to complete the task.  This person's work is limited to occupations which do not require complex written, verbal or mathematical skills.  This person may have only occasional interaction with the public and only occasional interaction with coworkers.  Assuming those facts and limitations, in your opinion could such a person perform the claimant's past work as . . . performed . . . ? Or as customarily performed? (Tr. 76-77).

The VE found that while Plaintiff would be unable to perform her past relevant work, she could perform the unskilled, light work of a cleaner (3,310 jobs in the metropolitan Detroit area); assembler (950); and inspector (2,540) (Tr. 77-78).  The VE testified that if the above-described individual were limited to sedentary work, she could perform the work of

---

[4]20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy*  work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

a sedentary inspector (263); sedentary assembler; hand packager (300); and order clerk (204) (Tr. 78-79). The VE testified that if the same individual were restricted to "no interaction with the public," the job or order clerk would be eliminated but the other three sedentary position job numbers would remain unchanged (Tr. 80). She found that the individual could also perform the position of sedentary sorter (184) (Tr. 80). The VE testified that if Plaintiff were unable to keep a schedule due to a mental impairment, all gainful employment would be eliminated (Tr. 80). The VE stated that her testimony was consistent with the information found in the Dictionary of Occupational Titles ("DOT") (Tr. 81). In response to questioning by Plaintiff's attorney, the VE stated that if the individual required more than "one 30-minute[] and two 15 minute[]" breaks each day, or, was required to take the breaks at unscheduled times, all sedentary, unskilled work would be eliminated (Tr. 82).

### D.    The ALJ's Decision

Citing Plaintiff's medical records, ALJ MacLean found that Plaintiff experienced the severe impairments of "arthritis lumbar spine, obesity, panic disorder without agoraphobia[5], and major depressive disorder" but that none of the conditions met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Appendix 1 (Tr. 28). The ALJ found that Plaintiff experienced mild limitation in activities of daily living and moderate limitation in social functioning, and concentration, persistence, or pace (Tr. 28-29). He concluded that

---

[5] While Dr. Badiggam, the consultative examiner, found panic disorder *with* agoraphobia, the ALJ noted that treating records (Tr. 769) indicated the absence of agoraphobia (Tr. 34).

Plaintiff retained the Residual Functional Capacity ("RFC") for sedentary work with the following limitations:

> [C]laimant can never climb ladders, ropes, or scaffolds; occasionally can climb ramps or stairs, balance, stoop, crouch, kneel, and crawl; should avoid all use of moving machinery and all exposure to unprotected heights; is limited to one to two-step, simple, routine and repetitive tasks, employed in a low stress job, defined as having only occasional minor changes in the work setting; and work would be isolated, with only occasional supervision (Tr. 29-30).

Citing the VE's job findings, the ALJ found that Plaintiff could work as a bench assembler and packer (Tr. 36, 77-80).

The ALJ discounted the claims of limitation, stating that "the objective evidence of record weighs heavily against" a disability finding (Tr. 35). The ALJ noted that Plaintiff was able to care for her five-year-old daughter (Tr. 35). He observed that Plaintiff's treatment had been "routine and conservative" (Tr. 35). The ALJ found that Plaintiff's credibility was undermined in part by a 2011 conviction for credit card theft (Tr. 35).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and

"presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the

-14-

residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A.  The Credibility Determination

In her first argument for remand, Plaintiff disputes the ALJ's determination that her claims were not credible.  *Plaintiff's Brief,* 17-18, *Docket #11.*  In particular, she faults the ALJ for finding that her failure to show up for psychological counseling sessions undermines her allegations of disability.  *Id.*

Plaintiff is correct that the ALJ must consider possible explanations for her failure to attend counseling sessions.  Pursuant to SSR 96–7p, 1996 WL 374186, *7 (1996), an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment."  In reference to the therapy records, the ALJ stated that in August, 2011, Plaintiff "was discharged from mental health services for failure to keep scheduled psychotherapy appointments," (Tr. 33), later noting that her "noncompliance with prescribed treatment" undermined the disability claim (Tr. 34).

Plaintiff's argument that her "non-compliance" with therapy ought to have been considered as "part of her psychiatric disorder" is not well taken.  *Plaintiff's Brief* at 18.  The

ALJ acknowledged Plaintiff's testimony that she did not leave the house "except to attend medical appointments" and elicited her testimony she got rides to her appointments from a friend (Tr. 30, 53). This testimony by itself supports the conclusion that neither psychological nor transportation limitations prevented Plaintiff from attending the therapy sessions. Moreover, as noted by Defendant and confirmed by my own review of transcript, the medical records indicate that Plaintiff sought and received treatment for a number of conditions during the same period. *Defendant's Brief,* 18, *Docket #12* (*citing* Tr. 795, 797, 799, 812, 814, 815-825). While Plaintiff was able to obtain treatment for physical complaints in June, July, October, and December, 2011, she did not attempt to restart psychological treatment until March, 2012 (Tr. 1000). Notably, the March, 2012 records suggest that Plaintiff sought psychological treatment in large part for the purpose of strengthening the disability claim (Tr. 1000).

The remainder of the ALJ's credibility determination is generously supported by the record (Tr. 35). The ALJ noted that Plaintiff was able to take care of her five-year-old child and that she reported good results from her pain medication (Tr. 35). The ALJ observed that Plaintiff's claim of intractable back pain stood at odds with the imaging studies showing only minimal evidence of arthritis (Tr. 35, 540, 871-875). He noted that Plaintiff's treatment had been wholly conservative (Tr. 35). He reasonably determined that Plaintiff's credibility was undermined by her 2011 conviction for credit card theft (Tr. 35). Because the credibility findings are well explained and well supported, the discretion generally allotted to an ALJ's

-16-

credibility determination is appropriate here. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir.2007); See also *Anderson v. Bowen,* 868 F.2d 921, 927 (7th Cir.1989) (citing *Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir.1986))(An ALJ's "credibility determination must stand unless 'patently wrong in view of the cold record' ").

### B.  The RFC

Next, Plaintiff contends that the RFC crafted by the ALJ is unsupported by the findings of any physician. *Plaintiff's Brief* at 19-20 (*citing* Tr. 29-30).  Plaintiff also argues that her need for a cane (omitted from the limitations found in the RFC) is established by Dr. Edmond's January, 2008 consultative report. *Id.* (*citing* Tr. 542).  Plaintiff notes that her allegations of physical limitation are supported by Dr. Kaura's finding that she required help with meal preparation, shopping, laundry, and housework. *Id.* at 19 (*citing* Tr. 580).

Substantial evidence supports the RFC's inclusion of some of the professed limitations and the omission of others.  Further, the ALJ did not err in drawing from multiple portions of the transcript in composing the RFC; Plaintiff's claim that the ALJ erred by failing to rely on just one source is without merit.  20 C.F.R. § 416.945(a)(c)(the RFC, based on all relevant evidence, is within the purview of the ALJ's discretion).

The omission of "cane use" from the RFC is well supported and discussed (Tr. 31). Plaintiff acknowledges that she no longer uses a cane, but that contends that her testimony that she *formerly* required a cane should credited.  *Plaintiff's Brief* at 19 (*citing* Tr. 550-551). However, substantial evidence supports the ALJ's finding that Plaintiff never required the

-17-

regular use of a cane.   He noted that while Plaintiff brought a cane to the January, 2008 consultative examination by Dr. Edmond, the treating records contained "no evidence that a cane was prescribed" or that Plaintiff "demonstrated difficulty walking" (Tr. 31).   He permissibly discredited Dr. Edmond's report on the basis that it was supported only by Plaintiff's subjective complaints and contradicted by the imaging studies showing minimal abnormalities (Tr. 31).

Further, the ALJ did not err in declining to adopt Dr. Kaura's March, 2009 finding that Plaintiff required help performing household chores and shopping (Tr. 33, 580).   The ALJ correctly noted that Dr. Kaura's assessment stood at odds with her own treating notes characterizing the arthritis as "minimal" (Tr. 33).   My own review of Dr. Kaura's treatment notes supports the ALJ's findings.   May, 2007 records state that an examination of the back was unremarkable despite Plaintiff's claim that her pain had been exacerbated by moving a refrigerator (Tr. 514, 523).   October, 2007 and February, 2008 records note that Plaintiff did not appear to be in acute distress (Tr. 618, 671).   November, 2008 records state that Plaintiff was able to help a relative with household chores (Tr. 632).   While Plaintiff reported increased back pain in February, 2009, she indicated that the pain had been brought on by "heavy work" (Tr. 636).

Because substantial evidence generously supports the RFC crafted by the ALJ, remand on this basis should be denied.

-18-

### C. Migraine Headaches

In her third and fourth arguments, Plaintiff contends that the ALJ improperly discounted her limitations as a result of migraine headaches. *Plaintiff's Brief* at 20-23, 23-26. She faults the ALJ for failing to include migraine headaches among the severe impairments at Step Two of the administrative analysis or including reference to the condition in the RFC. *Id.*

"[T]he second stage severity inquiry, properly interpreted, serves the goal of administrative efficiency by allowing the Secretary to screen out totally groundless claims." *Farris v. Secretary of HHS*, 773 F.2d 85, 89 (6th Cir.1985). "To determine that a claimant has a severe impairment, the ALJ must find that an impairment or combination of impairments significantly limits the claimant's ability to do basic work activity." *Rogers v. Commissioner* of Social Sec., 486 F.3d 234, 243, fn. 2 (6th Cir.2007); 20 C.F.R. § 416.920. An impairment can be considered "not severe ... only if the impairment is a 'slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience.' " *Farris*, 773 F.2d at 90 (citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir.1984)). A non-severe impairment is one which does not "significantly limit [the] physical or mental ability to do basic work activities." 20 C.F.R. § 416.921(a).

Plaintiff's argument that the ALJ overlooked her limitations as a result of migraine headaches is not well taken. Although Plaintiff claims that the ALJ did not consider the

-19-

alleged migraine headache limitations, the ALJ acknowledged the testimony regarding the migraines and that Plaintiff obtained "intermittent relief" with the use of medication (Tr. 30, 57, 66-67). The absence of objective evidence supports the conclusion that the condition did merit further discussion at Step Two. Dr. Badiggam's January, 2008 examination report does not mention migraine headaches among the alleged conditions (Tr. 552). Likewise, Dr. Edmond's three-page consultative report regarding Plaintiff's physical limitations makes no mention of migraine headaches (Tr. 542-544). As noted by Defendant, Dr. Kaura's July, 2009 assessment does not list headaches among Plaintiff's conditions. *Defendant's Brief* at 24 (Tr. 655). While a number of the treating records make reference to Plaintiff's report of migraine headaches, her testimony of frequent and debilitating episodes is unsupported by any objective studies. A CT of the head and imaging studies of the cervical spine performed in April, 2011 were normal (Tr. 875-876). The records before the ALJ support the conclusion that the migraines did not amount to a work-related limitation.

In addition, I disagree with Plaintiff's related contention that the ALJ erred by declining to order further testing or consultative examination. Pursuant to 20 C.F.R. § 404.1512(a), a claimant is required to "'furnish medical and other evidence that [the SSA] can use to reach conclusions about [her] medical impairment(s) and ... its effect on [her] ability to work on a sustained basis.'" *Cranfield v. Commissioner, Social Security,* 79 Fed.Appx. 852, 858, 2003 WL 22506409, *5 (6th Cir. November 3, 2003)(citing § 404.1512(a)). Where the existing grounds provide more than adequate grounds for determination, "'[t]he ALJ is

-20-

not required to 'ferret out' additional records that the claimant neglected to procure." *Griffin v. Commissioner of Social Sec.,* 2014 WL 2864953, *6 (E.D.Mich. March 31, 2014)(*citing Nabours v. Commissioner of Social Sec.,* 50 Fed.Appx. 272, 275, 2002 WL 31473794, *2 (6th Cir. November 4, 2002)). *See Boyes v. Secretary of Health and Human Services* 46 F.3d 510, 512 (6th Cir.1994); *accord Halsey v. Richardson*, 441 F.2d 1230 (6th Cir.1971)( "Claimant bears the burden of proving his entitlement to benefits").   Plaintiff's counsel did not state at the hearing that the record was incomplete.   A full 490 pages of the 1000-page transcript consist of medical records.   These records provide more than an adequate basis to determine that Plaintiff did not experience work-related impairments other than the ones listed at Step Two.

In closing, I note that my own review of the transcript shows that the ALJ's non-disability determination is amply supported.  While Plaintiff alleged that extreme exertional and postural limitations created disability as of September, 2007,  treating notes created over a year later state that she experienced back pain after performing "heavy work" (Tr. 939).  The July, 2011 records show that she was able to ride a bicycle (Tr. 818).  March, 2012 records note that while Plaintiff alleged emotional problems, good physical health was listed as one of her "strengths" (Tr. 1000).   The treating and consultative records show that Plaintiff did not experience significant concentrational problems and presented with an appropriate affect.

Because the determination that Plaintiff was capable of a significant range of unskilled, sedentary work is well within the "zone of choice" accorded to the fact-finder at the

administrative hearing level, it should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment [Docket #18] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #15] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. Willis v. Secretary of HHS, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

-22-

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court.  The response shall address, specifically  and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: February 28, 2015

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on February 28, 2015, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager